IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

LAWRENCE G. RUPPERT and
THOMAS A. LARSON,
on behalf of themselves and on
behalf of all others similarly situated,

                          Plaintiffs,                          OPINION and ORDER

                                                               08-cv-127-bbc
              v.

ALLIANT ENERGY CASH BALANCE
PENSION PLAN,

                          Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

         In this class action brought under the Employee Retirement Income Security Act of

1974 (ERISA), 29 U.S.C. §§ 1001-1461, plaintiffs contend that defendant Alliant Energy

Cash Balance Pension Plan underpaid them when it calculated the lump sum distributions

of their retirement benefits.   Now before the court are the parties' cross motions for

summary judgment, defendant's motion for leave to file a surreply and plaintiffs' motions

to exclude certain portions of the reports and testimony of defendant's experts.

         Understanding the parties' arguments requires some background about the plan and

the laws that applied to it between 1998, when it was established, and 2006, when the

applicable laws changed.   The plan at issue is a "cash balance plan," which is a term of art

under both ERISA and the Internal Revenue Code, which incorporate parallel laws and regulations governing retirement income plans. A cash balance plan is one in which the plan administrator establishes a "notional account" that includes hypothetical employer contributions, determined as a percentage of the employee's compensation, and hypothetical contributions, expressed as credits. Esden v. Bank of Boston, 229 F.3d 154, 158 (2d Cir. 2000). Under defendant's plan, interest on the hypothetical balances in employee accounts was to be "paid" (actually credited) to the employees' notional accounts at an "interest crediting rate" of the greater of 4% or 75% of the actual rate of earnings of the plan's trust fund.

The issue in this case is whether defendant made a proper calculation of the value of the hypothetical retirement accounts available to employees who chose to receive lump distributions of their accounts when they left Alliant's employ before reaching normal retirement age. At the time plaintiffs' lump sum distributions were determined, the law required the calculation to be performed using what pension law practitioners call "whipsaw." Id. at 159. The calculation was a complex one, made more so by the laws in effect at the time, and it carried some high risk as well. As the court explained in Esden,

> the rules governing distributions from defined benefit plans are framed in terms of the normal retirement benefit—typically, a single-life annuity payable at normal retirement age. Any distribution in optional form (such as a lump sum) must be no less than the actuarial equivalent of such benefit. For a cash balance plan this calculation involves projecting the cash balance forward and

> then discounting back to present value. The projection rates may be defined by the plan; but the discount rate is prescribed by statute. If the plan's projection rate exceeds the statutory discount rate, then the present value of the accrued benefit will exceed the participant's account balance. Unless this higher figure is paid out, the IRS takes the view that an impermissible forfeiture has occurred in violation of ERISA § 203(a) and I.R.C. § 411(a)(2).

Id.  In other words, the fund's pre-retirement distributions had to reflect the anticipated interest the fund would earn in the years between the employee's leaving and her retirement date, even though the employee was no longer a plan participant.  If it did not, the plan could be found out of compliance.

Behind this requirement was Congress's desire to insure that a lump-sum distribution of pension benefits would equal the value of the benefits the employee would have received had she waited until her normal retirement date and taken them in the form of a pension. Berger v. Xerox Corp. Retirement Income Guarantee Plan, 338 F.3d 755, 761 (7th Cir. 2003) (finding Xerox plan illegal because  "Xerox tells its employees who leave the company before they reach [retirement] age that if they leave their money with the company they will obtain a pension beginning at age 65 that will reflect future interest credits. They are offered the alternative of taking a lump sum now in lieu of a pension later, but the lump sum is not the prescribed actuarial equivalent of the pension that they are invited to surrender by accepting the lump sum because it excludes those credits.").

Because defendant used a variable rate (4% or 75% of the actual rate of earnings) for

3

its cash balance plan, it could not rely on a particular interest rate; rather, it had to select a method of reflecting the hypothetical future interest credits to which the plan participant was entitled. With the advice of a company specializing in ERISA plans, defendant chose to use the 30-year Treasury rate for both its calculations. Because this rate was the same one the law prescribed for determining present value, employees who left early and took their lump sum distributions received an amount that was equal to the amount in their hypothetical account balances.

Plaintiffs challenge defendant's use of the Treasury rate for both calculations. They do not, and cannot, challenge its use for the present value calculation because that use is required by law. Instead, they object to its use for determining future interest credits because, they say, it does not reflect the rate that defendant promised its plan participants, which was 4% or 75% of the actual earnings rate on the plan's trust fund. They have marshaled experts in an effort to show that the average interest credits over the class period should have been closer to 10%, whereas use of the Treasury rate averaged around 5.178%. For its part, defendant argues that the Treasury rate was close enough to the actual earnings rate to be reasonable and that commonly accepted definitions of "interest rate" and "present value" support defendant's decision to pay the plaintiff classes only their plan account balances by using the 30-year Treasury rate for both calculations.

I conclude that for the years in dispute, 1998-2006, defendant's method of

4

calculating projected future interest credits violated 26 U.S.C. § 411 because it did not fairly represent the interest rate promised in the plan. Plaintiffs' claims are not barred by the statute of limitations because defendant never informed the plan participants how it was calculating the projected future interest credits or that it was using a method that did not fairly represent the value of the promised future interest credits.

This leaves the question of what interest rate or rates defendant should use to estimate plaintiffs' future interest credits. Defendant's motion to file a surreply brief will be granted to allow defendant to argue that under the recent decision by the United States Supreme Court in <u>Conkright v. Frommert</u>, 130 S. Ct. 1640 (2010), the court should allow defendant to choose a new method for determining an unbiased rate. I conclude that <u>Conkright</u> has no bearing on the issue to be decided in this case. Deferring to the plan fiduciary would be inappropriate in a matter such as this one, involving the method for reflecting future interest credit, on which the plan administrator enjoys no discretion. At the same time, I cannot determine from the parties' submissions what method would best reflect the promised future interest credit. Therefore, I will leave that issue for trial.

I am able to resolve a few side matters related to damages. I conclude that plaintiffs are entitled to prejudgment interest because it is presumptively available in ERISA cases and it is fair to award it. I also conclude that a pre-retirement mortality discount should be applied to any calculation. Plaintiffs' failure to respond to defendant's arguments operates

5

as a concession that the discount is appropriate.

Finally, I will grant plaintiffs' motion to exclude portions of reports and testimony of David Godofsky and Ian Altman because the challenged testimony is nothing more than legal opinion and unsupported say-so, and Altman's March declaration is an improper supplementation of his expert report. I will deny plaintiffs' motion to exclude the reports and testimony of Vincent Warther regarding his use of the "Black-Scholes" model because defendant has adequately explained how that methodology may be reliable as used in this case. Plaintiffs can raise their concerns when cross-examining Warther at trial.

## I. MOTION TO EXCLUDE EXPERT REPORTS AND TESTIMONY

### A. <u>Godofsky and Altman, dkt. #260</u>

Plaintiffs have moved to exclude certain reports and testimony of David Godofsky and Ian Altman. First, plaintiffs take issue with portions of Godofsky's report and testimony related to his interpretation of the term "interest rate" as that term appears in the applicable law. This testimony includes an interpretation of the meaning of "interest rate," a description of the "intent" of Congress and explanation of the requirements of ERISA and the Internal Revenue Code.

Defendant contends that Godofsky should be able to testify about his understanding of legal terms because they "do not, in and of themselves, determine the outcome of the

instant matter." Def.'s Opp. Br., dkt. #270, at 5 (emphasis omitted).  However, defendant is mistaken; Godofsky's testimony goes directly to the question whether the law allows defendant to use the interest rate it did.  There can hardly be a more outcome-determinative legal conclusion.

The cases defendant cites do not support admissibility in this context.  Naeem v. McKesson Drug Co., 444 F.3d 593, 610 (7th Cir. 2006) (testimony about regulations that were "only a piece of evidence regarding whether one of the disciplinary actions against [plaintiff] was justified"); Hangarter v. Provident Life and Accident Insurance Co., 373 F.3d 998, 1017 (9th Cir. 2004) (expert's "reference to California statutory provisions—none of which were directly at issue in the case—[that] were ancillary to the ultimate issue of bad faith").  Because Godofsky cannot provide legal opinion on matters directly related to the ultimate issue, plaintiffs' motion to exclude Godofsky's testimony and reports will be granted with respect to his interpretation of meaning of "interest rate," conclusions about the intent of Congress and assessment of the requirements of ERISA and the IRC.  (Defendant points out that not all of Godofsky's testimony is legal and that at times his testimony is "purely actuarial opinion," but plaintiffs have not moved to exclude that testimony, only the testimony that is legal opinion.)

Next, plaintiffs challenge the testimony of Ian Altman, who (i) defines "unbiased" as the term is used in Berger v. Xerox Corp. Retirement Income Guarantee Plan, 338 F.3d 755,

7

760 (7th Cir. 2003); and (ii) asserts that the use of the 30-year Treasury rate is an "unbiased estimator" after comparing the 30-year Treasury rate to the plan's interest crediting rate for the years 1998 to 2006 and evaluating whether actual experience was "relatively close" to the 30-year rate.  Plaintiffs are correct that Altman cannot define the term "unbiased" because it is another legal conclusion on a matter directly at issue in this case.

With respect to (ii), the question is whether the testimony is a result of professional judgment.  Under Fed. R. Evid. 702, expert testimony must be "the product of reliable principles and methods" that have been applied "reliably to the facts of the case."  Altman's method of comparing nine years of rates and determining which ones were higher is a simple rate-comparison exercise that does not seem to require any actuarial expertise.

Although Altman should be allowed to testify about performing the simple exercise, it is another question whether Altman may draw conclusions from his comparison.  Altman does nothing more than put an expert's seal of approval on the positions defendant would like to argue from the calculations he performed.  Although Altman states generally that he relied upon "generally accepted actuarial methods and principles" in reaching his conclusion, nowhere does he or anyone else say that his method of comparing nine years of interest rates after the fact is a generally accepted method for determining whether a particular rate is "unbiased."  Nor could he; Altman's determination that the rate is "unbiased" is drawn from a dictionary definition, not a well-established actuarial method for testing interest rates.

8

Perhaps Altman's actuarial experience could support his notions about what approaches can be used to determine an "unbiased" rate; if so, he has not explained how it would. In this setting, his opinion is nothing more than *ipse dixit*. Therefore, I will grant plaintiffs' motion to exclude Altman's testimony with respect to his opinions that the 30-year rate is "unbiased" or "reasonable."

## B.  Warther and Altman, dkt. #278

Next, plaintiffs move to exclude (i) the expert reports and testimony of Vincent Warther related to his use of a Black-Scholes model to calculate the expected future interest crediting rate of the plan and (ii) the March 19, 2010 supplemental declaration of Ian Altman regarding whether the plan's 8.5% ERISA funding assumption can be used "as the core of an interest crediting projection rate" and whether the interest crediting rate can be determined by combining that funding assumption with a "spread" reflecting the amount the projected interest credit exceeds asset returns over time.

As to Warther, plaintiffs contend that his use of the Black-Scholes model should be rejected because it is a model used to price equity options and has not been shown to be reliable in the context of pricing portfolios including both equities and bonds. Defendant responds that the model has been used to price stock options of entities with both bonds and equities, such as Goldman Sachs and insurance companies. Also, defendant states that

9

concerns about bonds are related to a single bond's lack of volatility as the bond approaches maturity, an issue not present when multiple bonds are in play with differing maturity dates.

Defendant's response leaves questions. As plaintiffs point out, defendant (i) does not show that the Black-Scholes model produces reliable results in the context of pricing portfolios or that it has ever been used for such matters; (ii) does not explain why Black-Scholes's apparent effectiveness in pricing options of stocks of a firm holding bonds translates to effectiveness in pricing options of a portfolio of stocks and bonds; and (iii) does not explain why a *collection* of reduced-volatility bonds over time would still affect the underlying assumption in Black-Scholes modeling of constant volatility. However, these questions go to the weight of the evidence, not its admissibility. Defendant has made a sufficient showing of reliability to allow Warther's Black-Scholes modeling to be admitted.

Plaintiffs contend that Altman's March 2010 declaration is nothing more than an improper and untimely attempt to supplement his original expert report and that the opinions expressed in the declaration are too conclusory and subjective to be useful. There is no need to consider plaintiffs' second argument because they are right on the first.

In the original report filed in October 2009, Altman did not discuss whether the plan's funding assumption was proper or whether it would be proper to combine that assumption with a "spread" reflecting the amount by which the interest crediting rate exceeds the funding rate over time. Defendant contends that Altman's March 2010

10

declaration was merely a response to the declarations of Thomas B. Lowman, dkt. #209, and Clark L. Maxam, dkt. #224, filed in support of plaintiffs' motion for summary judgment. However, a review of those declarations belies defendant's contention. (The one exception might be Altman's statement in a footnote that Alliant's 8.5% funding rate assumption was "relatively aggressive for this time period," but this comment is too vague to be of any use.)

The Lowman declaration addresses payment calculations and does not mention the 8.5% rate or combining that rate with the "spread." The Maxam declaration states only that the plan used 8.5% and 9.0% funding assumptions throughout the operation of the plan without discussing whether it would be appropriate to rely on this rate as a base for calculating interest crediting rates or whether it would be appropriate to combine this rate with a "spread." The declaration describes the amount by which Towers's estimates of the plan's interest crediting rate exceeded its estimates of the plan's trust returns, but does not tie this information to the plan's funding assumption or suggest these numbers could be combined.

Because neither declaration included an opinion that it would be appropriate to use the 8.5% funding assumption or combine that rate with a "spread" to determine the interest crediting rate, defendant cannot "rebut" these declarations with new expert testimony. Defendant's argument that "[i]f the Court strikes Mr. Altman's supplemental declaration, then it should also strike plaintiffs' experts' declarations" fails, both because those

11

declarations are not in conflict with Altman's declaration, and more important, because defendant did not move to strike those declarations. Nonetheless, defendant may be assured that plaintiffs may not simply point to the Lowman or Maxam declarations to establish what Altman opposes.

## II.  CROSS-MOTIONS FOR SUMMARY JUDGMENT

Before turning to the facts, a word about procedure is in order.  As explained in the the court's <u>Procedure to be Followed on Motions for Summary Judgment</u>, which the parties received along with the pretrial conference order, dkt. #14, the parties are expected to file both briefs and separate proposed findings of fact.  They have done so, but seem to have missed the point of requiring the proposed findings of fact in a separate document, which is to allow the court and the parties to identify the factual disputes more easily.  This cannot be accomplished when the parties use the proposed findings of fact and their responses as an opportunity to make legal arguments and characterize the evidence.  The proposed findings of fact should be *purely* factual, as should any disputes, with the caveat that parties can also identify any evidentiary objection.  When a party wants to make an argument about the meaning of facts, or about the law, those words should be saved for the briefs.

Although these guidelines seem to be basic ones, they have not been followed in this case, and many proposed findings of fact and responses include irrelevant legal argument or

12

characterization of facts.  These arguments and characterizations have been disregarded.

Also disregarded are the many proposed facts related to defendant's intent.  In this case, plaintiffs contend that defendant's lump sum calculation was inappropriate, which comes down to whether the 30-year Treasury bond rate is a "fair" or "unbiased" estimator of future interest rates a participant would receive if he deferred distribution.  Berger, 338 F.3d at 760.  Although what it means for a rate to be a "fair" or "unbiased" estimator will be discussed in greater detail below, it is enough to say at this point that what the plan had in mind when choosing that rate is irrelevant.  The issue is whether it succeeded in choosing a fair, unbiased estimator.

Plaintiffs contend that intent should be relevant because a "pension plan is a unilateral contract" and the intent of the drafter should be explored to get at the fair estimate of the rate, citing Hurd v. Illinois Bell Telephone Co., 234 F.2d 942, 946 (7th Cir. 1956), and Mathews v. Sears Pension Plan, 144 F.3d 461, 465 (7th Cir. 1998).  However, the contract-like nature of a plan does not necessarily mean that intent is relevant.  As the court of appeals pointed out in Krawczyk v. Harnischfeger Corp., 41 F.3d 276, 279 (7th Cir. 1994), extrinsic evidence about a plan, including the drafter's intent, may be explored only after "a term has been held to be ambiguous as a matter of law."  No such ambiguity appears in this case:  the plan documents unequivocally require use of the 30-year Treasury rate when projecting the value of future interest credits.

13

Because intent is irrelevant, I will disregard those proposed facts related to whether defendant was attempting to comply with the law by following the advice of a "reputable" actuary, attempting to get away with underpayment or attempting to give its participants a particularly high interest rate (and a lower benefit credit) through its design.

Finally, the parties disagree about the relevance of facts related to plans other than the Alliant Plan.  There are two groups of such facts:  (1) facts related to "predecessor plans" of Alliant; and (2) facts related to other "cash balance plans" with identical or similar interest crediting rates.  Facts in the first group are admissible and those in the second group are not. Facts in the first group relate to the performance of earlier plans, which plaintiffs use as part of their assessment of what projection rate should have been used.  There is evidence, although disputed, that the performance of these previous plans is useful to help calculate the plan's future interest rates.

Facts in the second group relate only to testing performed on other "cash balance" plans.  Their similar or identical nature with respect to interest crediting rates is irrelevant when it comes to determining how the Alliant Plan's interest rates would be expected to perform.  Moreover, plaintiffs fail to explain how the plans' portfolios were sufficiently related so that they could be put in the same boat as predecessor plans.  Also, most if not all of those facts rely on evidence submitted in the context of separate lawsuits.  Although defendant may have had access to some or all of the data, it is not clear whether it had notice

14

that the evidence would be presented in this lawsuit.  Finally, even if it is useful, the evidence related to other plan's modeling would be cumulative of the evidence related to the modeling performed on the Alliant Plan.

From the parties' proposed findings of facts and the record, I find the following facts to be material and undisputed.

FACTS

A.  The Parties

1.  Plaintiffs

In an order entered February 12, 2009, I certified two subclasses in this case, defined as follows:

> a.  All persons who, since January 1, 1998, accrued under the terms of the Alliant Energy Cash Balance Pension Plan (the "Plan"), a vested or partially vested interest in a notional account balance established in their name by the Plan, including all persons who, at any time between January 1, 1998 and February 28, 2002, either (a) received a lump sum distribution of his or her cash balance formula benefit and/or (b) received any form of distribution calculated under the Plan's (or a related, prior plan's) prior formula after that benefit was determined to be more valuable than their benefit calculated under the Plan's cash balance formula and the estates of such persons and alternate payees under a Qualified Domestic Relations Order.

> b.  All persons who, since January 1, 1998, accrued under the terms of the Alliant Energy Cash Balance Pension Plan (the "Plan"), a vested or partially vested interest in a notional account balance established in their name by the Plan, including all persons who, at any time between February 29, 2002 and

15

August 17, 2006, either (a) received a lump sum distribution of his or her cash balance formula benefit and/or (b) received any form of distribution calculated under the Plan's (or a related, prior plan's) prior formula after that benefit was determined to be more valuable than their benefit calculated under the Plan's cash balance formula and the estates of such persons and alternate payees under a Qualified Domestic Relations Order.

Plaintiff Thomas A. Larson is the named representative of subclass A; he is a former employee of both Alliant and one of Alliant's predecessors and he is a plan participant who received a lump sum payment from the plan in 2000 in an amount equal to his notional account balance.  Plaintiff Lawrence G. Ruppert is the named representative of subclass B; he is a former Alliant employee and a plan participant who received a lump sum payment from the plan in 2006 in an amount equal to his notional account balance.

2.  The plan

Defendant Alliant Energy Cash Balance Pension Plan is an "employee pension benefit plan" and a "defined benefit plan" as those terms are defined under ERISA, 29 U.S.C. §§ 1002(2)(A) and 1002(35).  The plan "incorporates cash balance features, including an intent to pay benefits in a single lump sum equal to a Participant's Cash Balance Account."  Alliant Plan § 1.1, dkt. #232-2, at 7.

The Alliant Plan became effective in 1998 following the merger of three Wisconsin

16

and Iowa energy companies that formed Alliant Energy Corporation.  Before the merger, each of the three companies had retirement or pension plans:  the Wisconsin Power and Light Company Retirement Plan A, the IES Pension Plan and the Interstate Power Company Retirement Income Plan.  Through a series of transactions not relevant to this case, the assets of these three plans (minus the portion of the Interstate Power Plan attributable to bargained employees) were made a part of the Alliant Plan.

Alliant recruited an actuarial firm, Towers Perrin, to design the Alliant Plan (and serve as the plan's enrolled actuary). Towers suggested the plan's design, including the use of the 30-year Treasury rate as the "Actuarial Equivalent" of the cash balance account for the purpose of calculating lump sum benefits.

The Alliant Plan became effective January 1, 1998 through actions taken on August 19, 1998 by the Boards of Directors of Wisconsin Power and Light, IES and Interstate Power Company, which also approved the conversion of the plan's traditional pension formulas to a "cash balance" formula on that date.  The boards adopted an amended plan on October 20, 1998 to include a provision related to lump sum distributions that requires projecting the future value of cash balance accounts using the same interest rate employed to discount the result back to present value.

B.  Plan Terms

17

Under the terms of the Alliant Plan's cash balance formula, each participant received a "Cash Balance Account," which the plan defined as a "notional account maintained for reference only in determining a Participant's benefits payable under the Plan." The Cash Balance Account includes an "opening balance," "Benefit Credits" and "Interest Credits." The notional credits of the Cash Balance Account were not immediate benefits, but rather were elements of a formula designed to produce a targeted result at normal retirement age.

The "opening balance" is an amount calculated according to the benefits accrued as of the date the employee became a plan participant, or January 1, 1998 if the employee was a plan participant of any of the earlier plans that had been made a part of the Alliant Plan. The "Benefit Credit" is an amount allocated annually to the Cash Balance Account that is equal to 5% of the participant's pay as of December 31 of that year.

The "Interest Credit" is an amount credited annually to the Cash Balance Account equal to the product of the participant's cash balance account as of the first day of the Plan Year times an "interest crediting rate." The original plan documents provided that the "interest crediting rate" was 8.1% for the Plan Year ending December 31, 1998 but for all subsequent years, the rate was the greater of (1) 4% or (2) 75% of the actual rate of earnings of the Trust Fund for the Plan Year (except for the year in which the participant's Annuity Starting Date, in which case the interest rate would be a fraction of 4% corresponding to the number of complete months before the Annuity Starting Date). (The plan defines the

18

"Trust Fund" to include the assets of the plan held by a trustee or consisting of insurance contracts. Although the parties do not discuss the Trust Fund, presumably its assets are the same assets used to pay out benefits to plan participants.)

The Alliant Plan is a "frontloaded" interest plan, which means that an employee was not required to continue working to receive interest credits on his or her account until normal retirement age. Under the plan, participants accrue future interest credits on their account balances at the same time they receive corresponding benefit credits. After a participant terminates employment, interest credits, but not benefit credits, continue to be allocated to a participant's hypothetical account, until the participant takes a distribution of plan benefits.

During the class period, the plan provided that a participant who left employment before normal retirement age could take a lump sum distribution equal to the present value of the "Accrued Benefit." The "Accrued Benefit" was defined as the monthly benefit payable in the form of a single life annuity beginning on a participant's Normal Retirement Date equal to the greater of the "Actuarial Equivalent" of the participant's Cash Balance Account or the participant's "Grandparent Benefit" (the benefit he would have received under a predecessor plan). For the purpose of determining the "Accrued Benefit" of the Cash Balance Account, the Cash Balance Account must be "credited with . . . future interest from" the date of calculation to the normal retirement date. In so doing, "the Plan shall deem it

19

reasonable to credit future interest on a Participant's Cash Balance Account at the interest rate described in 1.2(b)(1) below," which is the preceding October's 30-year Treasury bond rate. Next, the "Actuarial Equivalent" is calculated by applying the "actuarial equivalency factors described in section 1.2(b)(1)," which require determining the present value of the plan using the same 30-year Treasury rate and a given mortality table. Alliant Plan, §§ 1.2(a) and 1.2(b)(1).

Because the plan documents call for using the same 30-year Treasury bond rate both to credit future interest to the account and to discount to present value, the calculation of a participant's Accrued Benefit under the plan always results in an amount equal to the participant's notional account balance (unless the present value of a "Grandparent Benefit" is greater).

The plan documents also include a provision providing that "[i]f any provision of the [Internal Revenue] Code or the Employee Retirement Income Security Act of 1974 renders any provision of this Plan unenforceable, such provision shall be of no force only to the minimum extent required by such section."

In December 2009, the Board of Directors of Alliant Energy Corporate Services, Inc. signed a unanimous consent resolution amending the terms of the plan to provide that, effective January 1, 2009, the "interest crediting rate" was equal to the annual change in the Consumer Price Index plus 300 basis points. Under the retroactive amendment, the 2009

20

rate became 6.65%.

### C.  Plan's Letter to IRS

On October 29, 1999, a lawyer acting on Alliant's behalf forwarded the plan document along with other materials to the IRS, requesting a favorable tax qualification determination letter for the plan.  Included in the packet of materials Alliant forwarded the IRS were calculations of accrued benefits to the IRS in its nondiscrimination testing in which the plan projected the value of the future interest credits at 7.5%.

### D.  Estimations of Future Interest Crediting Rates and Comparison to 30-year Rate

The parties have gathered several interest rate calculations and comparisons between interest rates and have performed their own calculations using different models aimed at assessing the "future" performance of the plan's 4%/75% interest crediting rate.

### 1.  Actual performance of interest crediting rate compared to 30-year rate

Since January 1, 1998, the plan's interest crediting rate formula (4% or 75% of earnings) has yielded the following annual returns, as compared to the actual rate of earnings for the plan's trust fund and the 30-year Treasury Rate.

| Year | Interest Crediting Rate | Trust Fund's Actual Rate of Earnings | 30-year Treasury Rate |
|------|------------------------|--------------------------------------|----------------------|
| 1998 | 8.100% | --- | 6.33% |
| 1999 | 7.125% | 9.50% | 5.01% |
| 2000 | 4.000% | 4.80% | 6.26% |
| 2001 | 4.000% | 0.60% | 5.80% |
| 2002 | 4.000% | -8.60% | 5.32% |
| 2003 | 16.950% | 22.60% | 4.93% |
| 2004 | 8.250% | 11.00% | 5.16% |
| 2005 | 4.000% | 4.90% | 4.86% |
| 2006 | 9.600% | 12.80% | 4.68% |
| 2007 | 5.475% | 7.30% | 4.85% |
| 2008 | 4.000% | -29.2% | 4.77% |
| 2009 | 17.325% under original terms; 6.650% under 2009 amendment | 23.1% | 4.17% |

Using arithmetic averages, the interest crediting rate exceeded the 30-year Treasury rate on average (a) 197 basis points from 1998 to 2006; (b) 159 basis points from 1998 to 2008; and (c) 166 basis points from 1998 to 2009 (using the 6.65% interest crediting rate for 2009).  (A "basis point" is equal 1/100th of a percentage point.)   Using geometric compound averages going back to data from predecessor plans from 1986 through 1997, the interest crediting rate exceeded the 30-year Treasury rate by (a) 189 basis points from 1998

22

to 2006; and (b) 246 basis points from 1998 to 2009 (using the 17.325% interest crediting rate for 2009).

In 1998, the 30-year Treasury rate was 6.33% and 75% of the plan's investment goal was 6.37%. In every year from 1998 to 2006, the 30-year rate was less than 75% of the plan trust's actuarial assumed rate of return.

2. Historical analyses

The Alliant Plan had three "predecessor" plans, the Wisconsin Power Plan, the IES Plan and the Interstate Power Plan, none of which were cash balance plans. In 1998, the IES Plan had a 65% equity portfolio and the Wisconsin Power Plan had a 60% equity portfolio. The Interstate Power Plan was invested 100% in bonds. Starting February 1, 1999, the Alliant Plan had a target of 65% in equities, although the actual asset allocation changed frequently from 2000 to 2009, ranging from 57.5% in equities to 72.9%.

From 1986 to 1997, the IES Pension Plan and the Wisconsin Power Plan would have reflected the following interest crediting rates, assuming they had had the same 4%/75% formula the Alliant Plan supplied for interest crediting rates:

| Year | IES | Wis. Power |
|------|---------|------------|
| 1986 | 13.125% | 13.950% |
| 1987 | 4.350% | 6.525% |

| | | |
|---|---|---|
| 1988 | 10.050% | 9.225% |
| 1989 | 22.125% | 9.900% |
| 1990 | 4.000% | 4.000% |
| 1991 | 21.300% | 17.175% |
| 1992 | 4.050% | 6.300% |
| 1993 | 4.875% | 11.850% |
| 1994 | 4.000% | 4.000% |
| 1995 | 20.625% | 13.950% |
| 1996 | 8.625% | 9.150% |
| 1997 | 10.425% | 13.500% |

If these plans were "brought forward" to 2009 using the Alliant Plan returns, the geometric average compound crediting rate would be 9.02% for the IES Plan and 8.5% for the Wisconsin Power Plan. The Interstate Power Plan's return rates were "far lower" than the others. The predecessor plans had different volatility levels because of different levels of real estate, although the levels of real estate in each of these plans was between 0% and 3%.

The following chart compares the 30-year treasury Yield with what the IES Plan's annual interest crediting rate would have been from 1986 to 1997 applying the Alliant Plan's 4%/75% formula and what the Alliant Plan's interest crediting rate was from 1998 to 2007. (The chart combines the IES Plan's 1986-1997 rates and the Alliant Plan's 1998-2007 rates

24

and calls them collectively the "Alliant Annual Interest Crediting Rate")



(Defendant attempts to dispute the accuracy of the chart's representation of the 2006 and 2007 interest crediting rates but introduces no evidence in support of its position.)

In 2005, Towers Perrin calculated the geometric and arithmetic averages of the plan's trust returns from 1995 through 2004 and from 1998 through 2004 and compared them to the average interest crediting rates for Perrin's actuarial assumptions for the plan. The results from 1998 through 2004 showed that the average interest crediting rate had exceeded the average returns on the plan's trust over those seven years. Using the 10-year history of the three predecessor plans and assuming those plans had been cash balance plans with a 4%/75% interest crediting rate, the 10-year average crediting rate for each of those three plans would have been lower than the average return on assets for each of the plans. (For the IES Plan, the return on assets was 13.8% and the interest crediting rate would have been

25

10.85%; for the Interstate Power Plan, the return on assets was 10.9% and the interest crediting rate would have beeen 8.94%; for the Wisconsin Power Plan, the return on assets was 12.0% and the interest crediting rate would have been 9.69%).

According to long-term "Ibbotson" historical data, which includes historical rates of return for various classes of stocks, bonds and other financial measures, had the plan been in effect from 1926 through 2006, the geometric average interest crediting rate to date based on a portfolio containing 65% equities and 35% bonds would have been in excess of 10%. (The parties do not explain what makes data "Ibbotson" historical data.)   Under this analysis, the average interest crediting rate would be 10.54% and would exceed the average underlying plan asset returns by between 50 and 100 basis points.

In 2004, 2005 and 2007, Alliant considered long-term Ibbotson historical data dating back to 1926 for the purpose of preparing audited financial statements under the applicable Financial Accounting Standards Board practices.

Alliant also considered historical analyses during the plan design stage.  In 1996, Towers Perrin presented Alliant with a 10-year analysis of the three predecessor plans' returns.  The summary showed 10-year average returns for the predecessor plans ranging from 10.9% for the Interstate Power Plan, 12.0% for the Wisconsin Power Plan and 13.8% for the IES Plan.  In February 1997, the Wisconsin Power Plan's historical trust returns from 1987-1996 were analyzed.  The results showed that, applying the plan's 4%/75% interest

credit formula to results in those years, participants would have earned annual interest credits ranging from 4% to 17.2%, with a 10-year average of 9.1%.  In October 1998, after the plan had been converted to a cash balance design but before the formal terms of the plan had been memorialized, the plan administrator told the plan's investment consultant, Yanni, that the returns for the three predecessor plans were 13.29% for the IES Plan, 11.95% for the Wisconsin Power Plan and 9.75% for the Interstate Power Plan.  Using these historical returns, Yanni recommended an asset allocation of 65% equities, 30% fixed income and 5% cash because that mix "produced the optimal risk/return profile when back tested over a 10-year period" and resulted in an average return of 12.49%.

Long-term historical Ibbotson data showed that the compounded return earned in the Long Term Government Bond Yield from 1926 to 1998 was 5.15%.  From 1977 to 1998, the compound interest crediting rate of the 30-year Treasury bill was 9.148%.

3.  Stochastic modeling analyses

Stochastic modeling, also known as "Monte Carlo" modeling, involves estimating probability distributions of potential outcomes by generating simulations reflecting random variation in one or more inputs over time.  The stochastic method generates a representation of real-life scenarios by building volatility and variability into the simulation, including extreme ups and downs.  The analysis provides a distribution of possible outcomes by

27

making assumptions about various asset classes, potential returns, volatilities and correlations with each other and then generating a number of possible future outcomes. The results of a stochastic analysis can be represented in terms of a mean or median of the distributed outcomes.   In the context of projecting future portfolio returns, a stochastic model returns a range of probabilities on the distribution of a return on a portfolio.

On at least eleven separate instances from the plan design stage in 1996 through the present, investment consultants or actuaries performed stochastic modeling for the Alliant Plan or Alliant for the purpose of projecting portfolio returns, interest crediting rates, actuarial funding measures or accounting measures.   On two occasions, the stochastic analysis was used to forecast interest crediting rates, once in the context of performing an "asset/liability" study and once in the context of making recommendations for a "pension investment strategy."  (Defendant challenges plaintiffs' use of handwritten notes from defendant to show that stochastic modeling occurred in 1996, Plts' Exh. 28, dkt. #213, at 28, on the ground that defendant does not recall who wrote the notes or whether it performed stochastic modeling at the time.  However, defendant produced the notes during discovery, the notes appear in the context of a Towers Perrin presentation on a page comparing historical return rates and state  "in our modeling: slightly under 9 to slightly under 13%"; either Towers or Alliant could have performed stochastic modeling in 1996; and defendants have not suggested any alternative explanation for what "modeling" the

28

numbers could have represented. Although the notes alone do not serve as persuasive evidence that the stochastic calculations were accurate because the estimates are not supported by analysis or data, the notes are *some* evidence that stochastic modeling occurred in 1996 and defendant offers no evidence to dispute it.) Alliant used stochastic modeling as an input when it established the rate of return assumption for both Financial Accounting Standards accounting and ERISA funding purposes.

In 2001, Towers Perrin performed stochastic modeling for the plan as part of an overall study designed to project assets and liabilities. The modeling showed a compound average crediting rate of 8.23% over a 15-year period. Over the same 15-year period, the modeling showed a "compound return" on the plan's "current asset mix" of 7.71%. The modeling indicated that the long-term mean interest crediting rate would exceed the underlying forecasted long-term mean trust returns for Alliant's union plans by 0.52% on average each year. The forecasted mean interest crediting rate exceeded the forecasted mean 30-year Treasury rate by 2.76% each year.

Towers Perrin's modeling did not consider the effect that "active asset management" would have on the interest crediting rate. Alliant's own analysis revealed that active management had resulted in an increased portfolio for the plan of 240 basis points during the 5-year period ending September 30, 2005, which included the period during which Towers performed its stochastic modeling in 2001.

In 2007, Alliant retained Watson Wyatt, an actuarial and investment consulting firm, to perform an investment strategy consulting project for the plan. As part of its study, Watson performed stochastic modeling involving 5,000 simulations to project the interest crediting rate 25 years into the future. The modeling showed a median projected interest credit of 8.30%. As in the case of the Towers Perrin modeling, the interest crediting rate observed in the Watson modeling assumed passive rather than active portfolio management. At the time of Watson's modeling in fall 2007, the plan was concurrently operating on the assumption that active management added 40 additional basis points to return projections looking out five years. Under the Watson modeling, the forecasted long term median interest crediting rate exceeded the forecasted long-term median plan trust returns by 0.60% per annum.

Each stochastic simulation performed for the plan that reported an expected interest crediting rate showed expected interest crediting rates for the plan exceeding the plan's expected trust returns.

Plaintiffs' expert, Maxam, used stochastic modeling to project the plan's interest crediting rate forward on a year-by-year basis starting July 31, 1998, using data available prior to each particular year to estimate the rate for the year. Maxam ran 5,000 simulations using a set of assumptions developed for the Society of Actuaries in 2004. He made certain changes to the assumptions, including the volatility assumption. Had the Society's volatility

30

assumption been used, the interest crediting rate results would have been lower.  Maxam did not make a separate determination of the projected annual interest crediting rate for each year, but instead took an average of the averages created by the 5,000 simulations to estimate the interest crediting rate for each year.

Maxam determined that the projected interest crediting rate would have a median return of 10.73%.  Although the median return rate is the "accepted standard" in stochastic modeling, Maxam chose a more conservative rate of 8.45%, a rate at which Maxam was 80% confident that the actual interest crediting rate would be higher.  Maxam considered (i) the modeling performed by the plan in 1996; (ii) the long-term historical analysis based on "Ibbotson data"; (iii) the historical analysis using actual plan data back to 1986; and (iv) the plan sponsor's "intent" during the design phase when interest crediting rates were most often projected at 8-9%, which was to "match benefits" for most plan participants.

Maxam reported his results on the basis of an assumed asset allocation of 65% equities, 30% bonds and 5% cash although since 2003 the plan's target asset allocation has been 70% equities, 27% fixed income and 3% in "other."  Around the time the plan was created, on June 30, 1998, a plan-related document showed a targeted stock allocation of only 51.8%, but the document also proposed increasing that target to 65% equities.  From 2000 to 2009, the actual asset allocation of the plan, changed several times, ranging from 57.5% to 72.9%.  Under Maxam's stochastic modeling, just as under Alliant's 2001 and

31

2007 studies, the anticipated interest crediting rate consistently exceeded the anticipated trust returns by 50 basis points or more.

Modeling of the plan's performed by Yanni for 10-year projections resulted in the following rates of return:  at 60% equities -  6.4%, with a rate of 4.4% at the 75% confidence level, and at 70% equities - 7.0%, with a rate of 4.5% at the 75% confidence level

The Alliant Plan's enrolled actuary consistently determined that the expected return on assets for ERISA purposes was 8.5% in every year from 1998 to 2007.  Stochastic modeling was used in establishing these return rates. In addition, the plan used 9% from 1998-2005 and 8.5% from 2006–2007 as the expected rate of return on assets for "FAS87" accounting purposes.  Stochastic modeling results were used in determining this rate as well.

Initially, Towers set the projected interest crediting rate for funding purposes at 6.375%, which was 75% of the plan's assumed asset return of 8.5% at the time.  At some point, Towers began to adjust the projected interest crediting rate for funding purposes up to 7%, when it discovered that the interest crediting rate had started exceeding the return rate historically.


4.  Black-Scholes method

Defendant's expert, Vincent Warther, calculated the average interest crediting rate using a "Black Scholes" model of option pricing, a widely accepted method of valuing equity

32

options in financial economics.  Inputs to the Black-Scholes model are (i) the volatility of the underlying plan returns; (ii) the risk-free rate of return; (iii) the time to maturity of the option; (iv) the strike price; and (v) the spot price.  According to Warther, use of the model shows that the average interest crediting rate from 1998 to 2006 ranges from 6.59% to 7.60%. Warther estimated the rate by first estimating the volatility of the actual returns from January 2000 through September 2006 (dates for which there was quarterly data) and also considering the volatility of the three predecessor plans.

### D.  Statute of Limitations

After the plan adopted the cash balance format in August 1998, it did not issue an updated summary plan description explaining the plan's cash balance benefit and optional forms of distribution until sometime during the first quarter of 2001.  In addition, the plan did not send plan members any "summary of material modifications" regarding the plan's August 1998 conversion at any time between the date of conversion and the issuance of the updated summary plan description.  Before sending out the summary plan description, the plan sent out a number of other communications discussing the lump sum benefit option.

On or about July 10, 1997, employees of one of Alliant's predecessors, IEC, received a "Merger Update" announcement with the headline "Employees provided 'total compensation' benefits package." The update included a description of the new cash balance

33

plan, stating that:

> The Cash Balance Plan offers employees individual participant accounts that resemble a 401(k) plan, but with one important difference; IEC guarantees an employee's account will be credited with a minimum interest rate and IEC retains the risk of investment losses.

In a July 15, 1998 memo to all Alliant non-union employees, participants were told that "[u]nder the cash balance approach, your pension benefit is expressed as an account balance" and "[y]our vested account balance can be paid in a single, lump sum amount whenever you leave the company, regardless of your age."

In a July 31, 1998 memo, the plan explained that the "basic process" for calculating opening account balances for the cash balance plan was to (1) calculate the monthly annuity benefit the participant has earned as of January 1, 1998; (2) convert that monthly annuity benefit to a "lump sum amount" representing "the balance that you would need to have in a savings account at age 62 . . . in order to pay yourself the monthly benefit (calculated in Step 1) for the rest of your life"; and (3) determine the "lump sum amount you would need today that will grow to equal the lump sum amount you need at age 62."

After the plan converted to a cash balance formula, it sent an annual benefit statement to participants. In 1998, the statement was titled "Welcome to Alliant's new Cash Balance Pension Plan." In the statement, participants were told that "you can take your entire account balance with you if you leave before retirement"; "[y]our vested account

balance can be paid in a lump sum amount if you decide to leave the company—regardless of your age"; and "you can receive your entire account balance in one lump-sum payment." In describing the "Present Value of [the] Accrued Benefit," the statement told participants that "[i]t is easiest to think of this as a savings account you open on Jan. 1, 1998.  It would grow with interest until you reach age 62.  Then, it would pay you a monthly benefit for your expected lifetime from age 62 on, in an amount equal to the pension you have already earned."

Around the time of the cash balance conversion, Alliant also created a "Compass" website, which provided active participants Cash Balance Q&A informational materials created by the Alliant benefits department to explain how the cash balance plan worked.

After the initial "welcome" statement in 1998, the plan issued annual statements to participants in the first half of each year, notifying participants of their plan account balance. In the 1999 statement, participants were advised that "[y]our vested account balance can be paid in a lump sum amount if you decide to leave the company—regardless of your age." The annual statements issued to participants in 2000, 2001, 2002, 2003 and 2004 stated that the cash balance plan "creates an individual account for you that grows each year through a combination of Benefit Credit (based on your pay) and and Interest Credit" and "[i]f you leave the company before you retire, you can receive your vested account balance in a lump sum."

In the first quarter of 2001, the plan released a summary plan description.  With respect to the lump sum benefit option, the description told participants that "[i]f you elect this option, you can receive your vested account balance in a single payment."  In describing the option of deferring a distribution, the summary plan description explains that a participant will continue to receive interest credits if he or she "leave[s] [his or her] money in the plan."  The description explained that the opening balance for participants in a predecessor plan was the "January 1, 1998, present value of the benefit [participants] had earned [in the predecessor plan]."

Neither the summary plan description nor the previous communications nor Alliant website materials discussing the cash balance plan explained that participants' plans were "notional," that is, that their account balance was a hypothetical amount that served as part of the formula for determining participants' age 65 benefits, or that the plan calculated lump sums by projecting the notional account balance forward to normal retirement age using the 30-year Treasury rate and then discounting it back to present value using that same rate.

For participants who requested and received a lump sum between the plan's conversion and the first quarter of 2001 when the summary plan description was released, the plan sent out worksheets showing the lump sum calculated by reference solely to the dollar value of the participant's current account balance.  After the issuance of the 2001 summary plan description, the plan continued its practice of sending participants such

36

worksheets showing the lump sum calculated by reference solely to the dollar value of the participant's current account balance.  The worksheet the plan used did not show that defendant had calculated the lump sum by projecting the notional account balance forward to normal retirement age using the 30-year Treasury rate and then discounting it back to present value using that same rate.

Both plaintiffs Larson and Ruppert received communications after receiving their respective lump sum distributions that stated the amount of the benefit they would receive as lump sum distributions and telling them that they would receive the value of their account balance.

DISPUTED FACTS

The parties dispute several facts related to estimating future interest rates. Principally, the parties disagree about which model and calculation provide the best method for estimating future interest rates.  These disputes include:

- whether it is accurate to perform stochastic modeling using targeted asset allocations instead of actual allocations;

- what impact different asset allocations could have on calculating interest crediting rates using stochastic modeling or historical evaluation;

- whether considering the use of predecessor plans' returns or other past returns "inflates" an estimate of future rates and whether at least past periods that are unusual should be disregarded;

- whether an Ibbotson analysis such as Maxam's fails to reflect the "equity risk premium" (a calculation of the expected return on stocks less the risk-free rate of return);

- whether using stochastic modeling to produce one assumption in the "whipsaw" calculation (the interest crediting rate) will produce inaccurate results because the other assumptions to the calculation are "deterministic" and "static";

- whether Maxam's method relies on an improper volatility assumption;

- whether and how much information related to changes in return rate translates into information about interest crediting rate;

- whether Maxam's future asset allocations estimate was appropriate;

- whether the Towers projections in 2001, 2007 and 2008 and Watson's projections should be increased to reflect the value of active management, the conservative asset allocation and the "fat-tail property of equity distributions" (which, according to the record, is a property of equity distributions of having a higher probability of extreme results leading to more very positive and very negative results on the "tail ends");

- whether Yanni's method is comparable to other stochastic models; and

- whether the "Black-Scholes" method can be accurate when used to price the options of portfolios containing assets other than equities;

OPINION

A.  Statute of Limitations

The first issue to address is defendant's statute of limitations defense, if only because

38

it could resolve the case entirely.  In this case, defendant contends and plaintiffs do not deny that the applicable limitations period is six years, drawn from Wisconsin's breach of contract statute.  Cf. Doe v. Blue Cross & Blue Shield United of Wisconsin, 112 F.3d 869, 873 (7th Cir. 1997) (assuming that Wisconsin's six-year limitations period for breach of contract applies to ERISA § 502(a)(1)(B) claim).  The question is whether the claims of the named plaintiffs and their subclasses accrued more than six years before this lawsuit, which was filed on February 29, 2008.

According to defendant, all of subclass A and most of subclass B, including named plaintiff Ruppert, received adequate notice of their claims before February 22, 2002. (Defendant acknowledges that some class members of subclass B first received notice of their claim after February 29, 2002 because they did not receive their initial summary plan description until then.)  Defendant makes two arguments:  (1) the various communications and the summary plan description defendant sent to these class members before Feburary 29, 2002 put them on notice of their injury; and (2) if not, at least all members of subclass A were on notice of their injury before February 29, 2002 because they had all received their lump sum payouts by then.

Although state law provides the applicable statute of limitations, federal common law provides the standard for determining when the statute of limitations begins to run. Tolle v. Carroll Touch, Inc., 977 F.2d 1129, 1139 (7th Cir. 1992) (citing Cada v. Baxter

39

Healthcare Corp., 920 F.2d 446, 450 (7th Cir. 1990)).  The federal rule is that the statute of limitations begins to run once defendant "performs the alleged unlawful act and once [plaintiff] discovers an injury resulting from this unlawful act."  Id.  As the court of appeals pointed out in Cada, 920 F.2d at 450, the date may come after "the date on which the wrong that injures the plaintiff occurs" because "the date . . . on which the plaintiff discovers that he has been injured" may come after the date of the injury itself.

The first question to decide is when the injury occurred.  Berger v. AXA Network LLC, 459 F.3d 804, 815 (7th Cir. 2006).  Defendant contends the alleged injury would have occurred as soon as the participants were notified of the allegedly illegal lump sum calculation, while plaintiffs contend no injury occurred before defendant performed their allegedly illegal calculation on a given participant's notional account to determine the lump sum distribution.  Defendant's theory is dubious, Thompson v. Retirement Plan for Employees of S.C. Johnson & Sons, __F. Supp. 2d___, 2010 WL 1257815, at 8 (concluding accrual occurred at time of lump sum calculation, noting that "the challenged actions are not the type an employer can undertake before a participant has elected and received his lump sum distribution").  However, it is not necessary to decide this dispute because even if defendant is correct, it has not shown that any class member was on notice of the injury before February 29, 2002.

Defendant contends that participants knew or should have known that the plan was

40

engaging in allegedly unlawful activity as early as 1998 when they started receiving communications explaining that any lump sum distribution they received would be equal to their account balance.  It does not explain how these communications would have put participants on notice that defendant may have been using an inappropriate method to calculate lump sum benefits.  Although defendant contends that participants had sufficient information about the facts surrounding the alleged injury, the record shows they were given a barebones, and in some ways misleading, description about what was going on with their accounts.

First, defendant never explained to participants that their "account balance" was a "notional account maintained for reference only in determining a Participant's benefits payable under the Plan."  Instead, defendant regularly referred to the account in terms suggesting the balance already contained their "benefit," by stating that the account balance could be "take[n] with you," suggesting that the balance was akin to a "savings account" and by telling participants they can "leave" their money in the account.  Because participants were not told their lump sum distributions had to be calculated from a notional account, they had no reason to think the account balance did not already include everything they were entitled to under the plan, their "benefit."

Second, even if participants could have been expected to assume that the account balance was nothing more than a calculation tool, they never received information that

41

defendant projected the account balance forward and discounted it back using the same rate. Perhaps an astute participant aware of federal "whipsaw" requirements (if any such participants existed) might have wondered, but even she would not have known whether to be concerned because it was unclear what relationship the participant's account balance bore to such calculation. (Did the balance reflect a pre-calculation amount or a post-calculation amount? What was the basis for the calculation?) Under these facts, it cannot be said that participants knew or should have known that defendant may have been performing the "whipsaw" calculation improperly.

What about when participants received the benefit? Again, participants were left in the dark about the nature of their "notional" account balance. Surprisingly, the worksheets they received did not even show the "whipsaw" calculation defendant was required to perform under the plan. Had a participant seen a calculation projecting the value forward and discounting it back using the same rate, she might have had reason to wonder. Instead, participants received nothing on this matter. Because participants knew nothing more about the nature of their account balance or the whipsaw calculation even at distribution, they cannot be held to have "known" about their injury.

Defendant points out that, in Thompson, 2010 WL 1257815, at 8, the court reached the opposite conclusion under identical circumstances, concluding that participants learned of their injury when they received lump sum distributions equal to the amount of their

42

notional account balance.  The court rejected the plaintiffs' argument that they did not know they had been injured because they were not aware of the projection rate applied or whether the calculation had been proper, pointing out that "[a]ccording to plaintiffs' reasoning, a pension participant could bring his claims 25 years after receiving a lump sum distribution, if he remained ignorant that the Plan employed an incorrect method of calculation."

However, at least in this case, the problem is not simply that participants remained ignorant for many years, it is that defendant *kept* them ignorant by suggesting their account balance was something it was not and keeping their whipsaw calculation entirely invisible. If a plan manages to keep illegal calculations secret for 25 years, why shouldn't participants be able to seek relief when the truth comes out?

Defendant's failure to communicate the nature of the account and the lump sum calculation is little different from other types of "hidden" injuries, such as the one in Connors v. Hallmark & Son Coal Co., 935 F.2d 336, 343 (D.C. Cir. 1991).  In Connors, the defendant falsified contribution reports, hiding the facts giving rise to the claim for breach.  Id. at 337, 343.  Regardless whether the defendant in that case was more to blame, the same "hiding" occurred here, where defendant did not disclose information about the nature of plan members' accounts or calculations, who could not have otherwise uncovered this key information through "reasonable diligence."  Carey v. International Board of Electric Workers Local 363 Pension Plan, 201 F.3d 44, 47 (2d Cir. 1999) (claim accrues when

43

plaintiff discovers or "with reasonable diligence" should discover injury). Participants could have discovered the calculation by seeking a copy of the plan documents and poring over them, but defendant does not argue that statute of limitations principles required plaintiffs to attempt such a feat. Defendant never gave notice to participants that it was performing whipsaw calculations on their notional accounts to calculate their lump sum benefits. Therefore, plaintiffs' motion for summary judgment will be granted and defendant's motion denied with respect to defendant's statute of limitations defense.

### B. Use of 30-Year Rate

1. Standard

Before 2006, ERISA and the IRC required plans to perform a "whipsaw calculation" to calculate the value of lump sum payouts of pension benefits before retirement age. 26 U.S.C. §§ 411(d)(6), 417(e)(3) (2005); 29 U.S.C. §§ 1053(e), 1055(g)(3) (2005) (On August 17, 2006, the Pension Protection Act was signed into law, amending the law so that whipsaw calculations were no longer required. All future citations to ERISA and the IRC are to those provisions in effect before the passage of the Pension Protection Act.) The whipsaw calculation is performed by projecting the balance of a participant's notional account forward to the participant's normal retirement age and then converting that future value back to a present value.

44

The parties' first disagreement is what the applicable law requires. Defendant points to a collection of statutes and regulations and actuarial definitions to support its position that the required "whipsaw calculation" should be performed using the same 30-year Treasury rate to project future values as is used to discount back to a present value.

Defendant points out, and plaintiffs agree, that the law requires the Treasury rate to be used, along with a mortality table, for the second part of the calculation, determining present value. 29 U.S.C. §§ 1053(e)(2) and 1055(g)(3) (in context of minimum vesting standards, present value "shall not be less than the present value calculated by using the applicable mortality table and the applicable interest rate," which is defined as "the annual rate of interest on 30-year Treasury securities . . ."); and 26 U.S.C. § 417(e)(3) (requiring same present value calculation).

One might assume that if the Treasury rate is a fair way of determining the present value (reducing the future interest credits to what they are worth today), it would also be a fair rate to use for projecting their future value. However, IRS Notice 98-6, § III.B.1, explains that the value of future interest credits must be calculated using the *plan's* specified rate to determine the future value of the hypothetical account balance, even though the Treasury rate must be used to discount the rate back to present value. Cf. Berger v. Xerox Corp. Retirement Income Guarantee Plan, 338 F.3d 755, 760 (7th Cir. 2003) (IRS Notice 98-6 is an "authoritative interpretation of the applicable statutes and regulations").

As Notice 96-8, § III.B.1, explains, in the context of lump sum calculations, the accrued benefit of a participant in a "frontloaded interest credit plan" such as defendant's must be "based on the employee's hypothetical account balance as of normal retirement age, including future interest credits to that age." The Notice goes on to state that the law prohibits the plan from projecting the value of future interest credits "using a rate that understates the value of those credits." Id. Determining the "accrued benefit" using future interest rates is a separate step from calculating the present value, which must be "calculated in accordance with the applicable interest rate and mortality table under section 417(e)(3)." Id. at § III.B.2. In Berger, 338 F.3d at 760-61, the court of appeals followed the directives of Notice 96-8, concluding that a plan's replacement of its interest credit rate with the rate used to discount to present value rate violated ERISA by understating the value of future interest credits.

The Notice explains how these requirements would play out by providing an example. Notice 96-8, § II.A. Supposing a plan provides for interest credits at a fixed rate of 8% and a § 417(e) rate of 6.5% at the time of a participant's termination, if that participant is 45 and has $45,000 in his hypothetical account at the time, the following calculation should be performed. First, the balance of the hypothetical account should be projected to normal retirement age using the 8% rate, with a result of $209,743. That amount should then be discounted to age 45 at the § 417(e) rate of 6.5%, for a present value of $59,524. As the

46

Notice explains, "if the plan paid the hypothetical account balance of $45,000, instead of $59,524, the employee would receive $14,524 less than the amount to which the employee is entitled." Id.

Defendant contends that IRS Notice 96-8 and Berger do not apply in this case because neither addresses what rate should be used for plans that tie the interest crediting rate to the returns of the plan itself. Notice 96-8, § III.B.1 limits its discussion to plans that specify either a "fixed interest rate" or a "variable outside index" rate, and Berger related to a plan using an outside index. However, neither Notice 96-8 nor Berger limits to these two circumstances the requirement that the plan's specified interest rate be used to calculate the value of future interest credits.

According to defendant, what makes its plan different has to do with the meaning of "interest rate" and "present value." Defendant's theory is that the dictionary and actuarial definition of "present value" support reading the law's reference to "present value" as requiring that the rate used to calculate present value be "the same rate the parties assume would be earned were that money invested," which defendant says would be the *plan*'s "interest rate." Thus, defendant says, the statutory requirement that "the . . . interest rate" be the Treasury rate means the *plan's* assumed rate of return must be assumed to be the Treasury rate, too. Because the Treasury rate determines the plan's rate, and the plan's rate determines the interest crediting rate, the Treasury rate could be used to calculate the plan's

47

interest credits.

This argument is not persuasive.  Cf. Berger, 338 F.3d at 760 (describing similar argument as "emptily semantic").  The statutes do not call for using the "present value rate" as though it were the standard "interest rate" to be used for all things related to the "present value."  They simply set the Treasury rate as the maximum rate to use for performing "present value" calculations.  Moreover, defendant's broad definition of "present value" as defining both the discount rate and the future projection rate collapses into requiring that *all* plans' future interest credits should be calculated using the 30-year rate, a principle that Notice 96-8 and Berger reject.  Nothing in the statutes suggests that the terms "present value" or "interest rate" relate to the plan's rate of return, and defendant does not explain why its rationale for applying the 30-year Treasury rate would not apply equally to fixed-rate plans or outside-variable plans.

Defendant points out that projecting future benefits at a rate higher than the rate used to discount those benefits back to "present value" results in participants' receiving more from an early lump sum distribution than they would be able to receive by deferring distribution, assuming they invested the amount at an earnings rate similar to the plan. That may be, but if so, this is simply an artifact of the statutory requirement that plans use a fair rate for determining future interest credits and that they use the Treasury rate to determine present value.  Although defendant may be concerned with "fairness" and what

48

they perceive as "windfalls," they must accept the law.  (At any rate, if defendant were concerned with windfalls, it could have crafted the plan to avoid offering high interest credits and instead offered one of the "safe harbor" rates listed in IRS Notice 96-8, § IV (listing "[v]ariable interest rates that may be assumed for these purposes to be no greater than the 30-year Treasury interest rate.").  It chose not to, perhaps to avoid paying out higher benefit credits.  Whatever the case, its arguments of "fairness" are suspect.)

Under Notice 96-8 and Berger, defendant was required to apply the interest crediting rate provided in the plan to determine the value of future interest credits.  The next question is how that rate should be calculated.  As § III.B.1 of the Notice notes, a calculation of the future interest credits to retirement age cannot be made with precision for a plan with an interest crediting rate that is not a fixed amount but instead is tied to a "variable outside index."  The same applies to a plan with a rate tied to its own returns, which are also "variable."  Although the Notice does not attempt to offer standards, Berger, 338 F.3d at 761, describes the required calculation as a "fair estimate of [future interest] credits" and elsewhere suggests that "one method" would be to find an "unbiased estimator" of future rates.  Id. at 760 (in this case, "one method of estimation would be just to use current one-year T-bill rate, on the theory that it is an unbiased estimator of future such rates"); see also Durand v. Hanover Insurance Group, Inc., 560 F.3d 436, 438 (6th Cir. 2009) (citing Berger in support of "fair estimate" standard).  However, what is meant by "fair" or "unbiased"

49

remains open to discussion.  Plaintiffs contend that the required calculation should be a "best estimate" and defendant says the standard should be simply what is "reasonable."  No side provides much explanation or any compelling evidence favoring one term over another.

As for defendant's alternative proposal that "unbiased" should mean not "tending to yield one outcome more frequently than another in a statistical experiment," that dictionary definition is out of place in the present context, in which the goal is to avoid "understating" the value of future interest credits.  Under defendant's definition, a rate of 5% would count as an "unbiased estimator" of a future interest crediting rate that fluctuated back and forth from 5% to 100% each year because 5% is yielded just as often as 100%.

At this point, it is not necessary to pin down the standard with any exactitude.  What matters is that the estimator have a low risk of understating interest credits.  The 30-year Treasury rate fails that basic test.  Because, as I explain below, the issue of damages cannot be decided at this time in light of the parties' factual disagreement, it is not necessary to decide exactly whether it is more appropriate to require the plan to estimate the future interest crediting rate with extra caution (as would be called for in plaintiffs' "best estimate" test) or with greater flexibility (as would be called for in defendant's "reasonable estimate" test), and whether, in a range of possible rates, the proper rate should favor preserving the plan or insuring that participants have received their fair share.  At trial, the parties should be prepared to explain their theories of damages in light of the different possible standards

50

and explain in greater detail why one standard is required over the other.

2.  Defendant's calculations

Even assuming that a plan should be given leeway in estimating future interest credits, defendant has very little evidence to support its theory that a 30-year Treasury rate would be an acceptable estimator.  Defendant's own comparison of the arithmetic average of the 30-year Treasury rate to the plan's interest crediting rate from its inception in 1998 until 2006 through 2009 puts the plan's interest crediting rate ahead from 1.5% to 2.0%. (Plaintiffs' comparison using geometric compounded averages shows similar results.) Although defendant points out that the average Treasury rate since 1977 is higher than the average over the span of the plan alone, defendant offers no way of comparing that string of years with the plan's performance.  Moreover, as plaintiffs point out, the higher *average* of the Treasury rate over time would not support using the fluctuating rate itself year-to-year. If the average were thought to reflect the plan's average rate, the number itself should have been used (9.148%), not the fluctuating rate.  What would be persuasive would be if the Treasury rate were expected to *track* the plan's rate, or expected fluctuations, from year to year.  This does not appear to be the case, as shown in the graph at page 24, which demonstrates marked differences between the Treasury rate and one of the predecessor plan as well as between the rate and the Alliant Plan once it was formed.

51

The only evidence defendant submits to support a finding that the 30-year rate would be appropriate are two data sets. The first set involves a comparison of rates between 1998 to 2006 showing that the interest crediting rate was higher than the Treasury rate barely less than half the years and lower barely more than half the years. However, the comparison does not address the amounts by which one rate exceeded the other. As explained above, such data supports defendant's theory only under an improper reading of "unbiased." In addition, the data defendant uses is skewed. Defendant treats 2006 as a half-year earning only 4% because the Pension Protection Act passed that year. This approach is improper; extraneous events such as the passage of a law are irrelevant to the question whether, in retrospect, one rate approximated another.

The only other data on which defendant relies is the fact that, in 1998, the Treasury rate reached 6.33%, which came close to 75% of the plan's investment goal of an 8.5% return on investments. If the plan met its investment goal in 1998, the interest crediting rate that year would have been 6.375% (75% of the return), a rate close to the Treasury rate that year. However, defendant does not explain how a single approximation in rates, not replicated before or after, could be sufficient to decide what *future* interest credits will look like. Moreover, the 6.375% rate was likely too low, as shown by the plan's decision later to raise that rate to 7% to reflect interest crediting rate performance over time.

The evidence shows that the 30-year Treasury rate would be expected to understate

52

the plan's interest crediting rate and is therefore not an acceptable estimator of the future interest credit rate.  Therefore, I will grant plaintiffs' motion for summary judgment on liability and deny defendant's motion.

## C.  Damages

### 1.  Decide or defer

After briefing had concluded, defendant moved for leave to file a surreply, pointing out that new Supreme Court law could have an effect on this court's damages determination. That motion will be granted.

In the surreply, defendant contends that the Supreme Court's recent ruling in Conkright v. Frommert, 130 S. Ct. 1640 (2010), "changes the legal landscape and would require the Court . . . not to make any finding regarding the appropriate remedy without first deferring the remedy issue to the Plan fiduciary."  Def.'s Br., dkt. #291-2.  Defendant is mistaken to think Conkright requires such deference in this case.

In Conkright, 130 S. Ct. at 1646-47, the Supreme Court concluded that a plan administrator could still enjoy the broad deference afforded under Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101 (1989), even after making an initial determination that is later found not to comply with ERISA.  In other words, as the Court put it, courts should not limit their deference to plan administrators on a "one-strike-and-you're-out" basis.  Id. at

53

1646.

However, Conkright does not pretend to expand the scope of Firestone deference beyond matters for which the plan administrator has "discretionary authority." The Court pointed out that, in the case before it, the plan administrator had been afforded "broad discretion in making decisions relative to the plan." Id. In this case, the only question to decide is one related to what the law requires of the plan when performing a particular calculation. The law prohibits a plan administrator from exercising discretion under these circumstances. As the IRS explained in Notice 96-8, § III.B.1, the method for "reflecting future interest credits" must be laid out so as to "preclude employer discretion," including with respect to any actuarial assumptions used in the calculation. Id. The role of the plan administrator in such a setting is merely ministerial, so it would make no sense to "defer." To the extent there was any discretion in setting a method for calculating lump sums, it was in the plan's *design*, a matter that cannot be remanded—the plan as it was *then* cannot be ordered rewritten now. (In addition, the plan as it is written *now* is not in issue, both because the law has changed and because the plan has been amended to provide a different interest crediting rate.)

Perhaps an argument could be made that, although originally the plan administrator could exercise no deference, the plan should be entitled to exercise its discretion now because a court has concluded that its original approach was incorrect and a remedy must be found.

54

This argument is not persuasive because it would give plans a way to circumvent the "no discretion" rule.  (There is little question which way the administrator's discretion will lean in this setting, which is probably why the "no discretion" rule exists in the first place.)

Defendant points out that in Thompson, 2010 WL 1257815, at 10, the court deferred to the plan administrator even without the benefit of Conkright.  In Thompson, the court declined to fashion a remedy, instead ordering the plan to recalculate the lump sum distributions itself according to law.  Id.  In so deciding, the court quoted with approval Durand, 560 F.3d at 442, in which the Court of Appeals for the Sixth Circuit stated that "adjudication of [the plaintiff's lump sum claim] need not put the district court on a path that ends with the court itself trying to estimate what [plaintiff's] future interest credits would have been. Rather, if the district court determines that the plan's methodology violates ERISA, the court could simply award injunctive relief that requires [the plan], in the first instance, to do what the law requires."

The approach followed by Thompson and Durand seems problematic, both because it seems to give discretion where none is due and because it is bound to bring the parties right back to the court.  Although the approach has the appeal of relieving the courts of the task of deciding a complicated and specialized matter, such an approach is bound to result in a second attack on defendant's decision.  Because there is no reason to defer to the plan on this question, there would be no advantage to having it decide the issue first.

55

2. Appropriate interest crediting rate

Although I conclude that there is no reason for this court to wait to address the question of damages, it is not possible to reach a final decision on damages at this stage because material facts are in dispute. At the same time, some matters can be trimmed away. Plaintiffs contend that the court should order lump sums recalculated using "no less than" a 9% future interest crediting rate, but also seek to establish 8% and 7.5% as "alternative minimum" rates. At this stage, it is not possible to determine whether 9% or some other number represents the appropriate rate, or even the minimum rate, because the parties' dueling experts raise too many questions about the accuracy of the opposing experts' calculations and their applicability in this setting. At the same time, plaintiffs' "alternative minimum" rates involve legal questions that can be decided now.

a. 9% minimum rate

According to plaintiffs, at a minimum, the court should order 9% to be used to estimate future interest credits because plaintiffs' stochastic modeling and historical evaluations support such a finding and Towers and other actuaries came up with results that support the 9% rate. At this stage, many facts remain in dispute. These include (1) whether plaintiffs' expert used the proper volatility assumption when performing stochastic modeling; (2) whether using the targeted equity allocation rather than the actual allocations leads to

56

reliable results; (3) whether historical analysis is appropriate for determining future rates, and if so, whether certain time periods should be disregarded in light of their "anomalous" nature; (4) whether active management can be expected to increase returns in the long run; (5) whether stochastic modeling results from Yanni and Watson undermine the results from Maxam; (6) whether data from predecessor plans is sufficiently related to inform an estimate of the plan's interest crediting rate; and (7) whether the Black-Scholes analysis creates a better estimate or fails in light of its ineffectiveness in evaluating mixed portfolios. There are others, but this list gives a flavor of the many reasons why it would not be proper to determine an interest rate at this point, or even a minimum rate. (The numbers suggested by the assorted calculations range from as low as less than 5% to more than 10%, although the parties focus on rates between 6.375% and 9%.)

Although factual disputes prevent making any determination about the final rate, one related issue can be resolved. The parties disagree about whether to apply 2009's pre-amendment rate or post-amendment rate when performing their calculations. There is no principled basis to use the post-amendment interest rate for 2009. The issue in this case is what future interest crediting rates could have been expected from the plan when the lump sums were calculated (well before the 2009 amendment). The future possibility of a plan amendment would not have been a proper consideration when determining those future rates.

57

b. 8% alternative minimum rate

Aside from their argument relying on interest rate calculations, plaintiffs seek to establish two "fallback" rates on separate grounds. Their first argument is that an 8% rate should be used as a minimum because that rate is specified in the plan.

Plaintiffs' interpretation of the plan documents does not hold up to analysis. Their theory is that, although the plan documents define "Actuarial Equivalent" in terms of the 30-year rate, once it is determined that the plan could not use the 30-year Treasury rate to project future interest, the Plan must draw on the alternative definition of "Actuarial Equivalent" (related to "conversion to an optional form") and use its 8% rate as the "assumption" that applies to determining the proper projection rate.

There are two problems. First, the alternative definition of "Actuarial Equivalent" applies only to "conversion to an optional form or time of payment." Plaintiffs argue for the first time in their reply brief that the mere act of determining the accrued benefit is a "conversion to an optional form or time of payment" because it "converts" the notional account into an "annuity." Not only is that argument waived, but it also lacks merit; such a reading would require the "Actuarial Equivalent" of a lump sum distribution to first be defined under the "Optional Form" provision rate and then under the "Lump Sum" provision. Second, the 8% rate plaintiffs seek to use appears only in the context of explaining what "present value" to use in the optional form setting. But that rate can *never*

58

be used when determining present value for lump sum distributions because the 30-year Treasury rate must be used.  Under plaintiffs' reading, the "Optional Form" provision becomes an awkward way for the plan to require the assumption of an 8% projection. Plaintiffs' attempt to fish for a rate in the plan must be rejected.

c. 7.5% alternative minimum rate

Next, plaintiffs contend that defendant should be held to a 7.5% interest crediting rate at a minimum under the doctrine of judicial estoppel because it represented to the IRS that it was using a 7.5% rate to calculate the accrued benefit for the purpose of "nondiscrimination testing."  In response to plaintiffs' arguments, defendant argues that judicial estoppel does not apply to its statement, which appeared in a letter to the IRS, citing Atlantic Limousine, Inc. v. NLRB, 243 F.3d 711, 715 (3d Cir. 2001), and even if it could, defendant has not received a favorable determination, citing New Hampshire v. Maine, 532 U.S. 742, 751 (2001).  Plaintiffs did not respond to these arguments, opposing only defendant's separate argument that the statement should not be held against it because it was made in the context of satisfying ERISA's "non-discrimination" rules.  Because plaintiffs failed to oppose defendant's arguments, they are waived, so plaintiffs' argument that defendant's letter to the IRS should be treated as a 7.5% alternative minimum must be rejected.  Therefore, I will deny plaintiffs' motion for summary judgment with respect to this

theory.

2.  Prejudgment interest

Although the exact amount of plaintiffs' damages has yet to be decided, the question of prejudgment interest can be addressed now.  Under federal law, prejudgment interest is "presumptively available" to victims of ERISA violations and whether to award such interest is a question of "fairness."  Fritcher v. Health Care Service Corp., 301 F.3d 811, 819-20 (7th Cir. 2002).  Defendant contends that plaintiffs should not receive such interest because they are already receiving a windfall and defendant did not commit fraud or misrepresentation when it went about computing lump sums.

Defendant seems fixated on the notion that plaintiffs are cashing in on a legal loophole or technicality that is unfair.  However, plaintiffs had a right under the law at the time to proper whipsaw calculations, a requirement that defendant could and should have anticipated.  Defendant cannot be heard to complain that plaintiffs will get a "windfall" when it could have avoided the "windfall" by choosing a safe harbor rate.  The fact that under the current law whipsaw calculations are no longer required does not matter.

Also, although defendant may be correct that it did not engage in fraud or misrepresentation, it is not free of blame.  It failed to inform participants about the whipsaw calculation, even while providing them with worksheets purporting to show defendant's

60

calculation of benefits.  This glaring oversight is troubling.

In sum, defendant's concerns are not enough to overcome the presumption that plaintiffs should receive prejudgment interest.  The next question is, at what rate?  The guiding principle is that "prejudgment interest must make the victim whole," First National Bank of Chicago v. Standard Bank and Trust, 172 F.3d 472, 480 (7th Cir. 1999).

Plaintiffs propose several rates, including the plan's expected return on assets, 8.5%; the assumed interest rate for actuarial equivalence, 8%; and the 30-year Treasury rate.  As for the first two rates, plaintiffs do little to justify their use; it is hard to see how plaintiffs would be "made whole" only if they received what the plan *expected* to receive during that time.

With respect to the 30-year Treasury rate, plaintiffs' justification for using it is confusing:

> The reason for this is that under IRC ss 417(e), the applicable interest rate is based upon the annuity starting date, which is defined as the date a participant first receives a payment from the plan. . . . Section 417(e) would require that the value of the original payment plus the discounted value of the second payment (made currently) as of the original payment date equals the value of the correct lump sum owed as of the original payment date. . . . This is algebraically equivalent to crediting the second payment with interest at the same rate as used to discount the lump sum from age 65 to the original payment date.

Plts.' Br., dkt. #227, at 32 (citations omitted).  I understand plaintiffs to be saying that to insure that the "present value" of the *total* lump sum amount is not less than the present

61

value calculated using the 30-year rate, any amount paid *now* would have to be at least enough to insure that it would equal the amount underpaid when discounted back to the original distribution date using the 30-year rate.

Plaintiffs' concern with the requirements of § 417(e) is a red herring.  The purpose of prejudgment interest is to make the plaintiff whole.  Under the terms of the plan, plaintiffs were not entitled to a § 417(e) rate to apply to post-distribution matters for underpayments.  Plaintiffs are entitled to receive any underpayments, not as a convoluted function of the original lump sum calculation, but as a remedy for the failure to make a total payment.  The appropriate interest rate to use is not that used during whipsaw calculations, but rather the standard prejudgment rate in ERISA cases, which is the prime rate.  Fritcher, 301 F.3d at 820; see also Berger v. Xerox Retirement Income Guaranty Plan, 231 F. Supp. 2d 804 (S.D. Ill. 2002) (applying prime rate in whipsaw case).

The only question left to answer is whether to apply the prime rate as it is on the date of judgment or an average of rates over time.  As defendant points out, the average over time will involve a lot of work because this is a class action and the rate will have to be determined for each plaintiff, while a single rate would be easy to apply to all class members. Plaintiffs do not challenge defendant's preference for simplicity, so I will apply the prime rate as it is on the date of judgment to calculate the amount of prejudgment interest each plaintiff should receive on his or her prejudgment deprivation.

62

3. <u>Mortality discount</u>

Defendant contends that a pre-retirement mortality discount should be applied when calculating the new lump sum benefits. Plaintiffs decline to include such a discount in their damages calculations on the ground that <u>Berger</u>, 338 F.3d at 764, rejected using a mortality rate discount in that case. Defendants distinguish <u>Berger</u>, pointing out that in this case the plan documents require applying a pre-mortality discount and the court did not suggest any such documents were present in <u>Berger</u>. Plaintiffs do not respond to this argument, instead addressing only defendant's separate argument that <u>Berger</u> may not have "carefully considered what ERISA provides." Plaintiffs' failure to oppose defendant's argument operates as waiver, meaning a mortality discount must apply. (At any rate, I agree with defendant that <u>Berger</u> is different: in that case the use of a mortality discount would not make sense because someone would be able to fill the shoes of the decedent, meaning no value would be lost. <u>Id.</u>)


ORDER

IT IS ORDERED that

1. The motion to exclude the proffered reports and testimony of David Godofsky and Ian Altman filed by plaintiffs Lawrence G. Ruppert and Thomas A. Larson, dkt. #260, is GRANTED with respect to the reports and testimony of David Godofsky related to the

63

meaning of "interest rate," the intent of Congress and the requirements of ERISA and the IRC and with respect to the reports and testimony of Ian Altman related to his opinions that the 30-year rate is "unbiased" or "reasonable."

2. Plaintiffs' motion to exclude expert reports and testimony of Vincent Warther, dkt. #278, is DENIED and the motion to strike the March 2010 declaration of Ian Altman, dkt. #278, is GRANTED.

3.  The motion to file a surreply filed by defendant Alliant Energy Cash Balance Pension Plan, dkt. #291, is GRANTED.

4.  Plaintiffs' motion for summary judgment, dkt. #206, is GRANTED with respect to plaintiffs' claim that defendant violated ERISA by understating the value of plaintiffs' future interest credits when performing a calculation of plaintiffs' lump sum distributions and with respect to defendant's statute of limitations defense and DENIED in all other respects.

5.  Defendant's motion for summary judgment, dkt. #203, is DENIED.

Entered this 3d day of June, 2010.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

64